**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RUSSELL WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18 cv 4028 |
| | ) | |
| MICHAEL WHITE, ERIC REYES, | ) | |
| SEBASTIAN FLATLEY, BRIAN DALY, | ) | |
| RAUL BAEZA, JR., THOMAS GAYNOR, | ) | |
| the CITY OF CHICAGO, THOMAS | ) | |
| FINNELLY, COOK COUNTY, and | ) | |
| UNIDENTIFIED CHICAGO POLICE | ) | |
| OFFICERS and COOK COUNTY STATE'S | ) | |
| ATTORNEY INVESTIGATORS, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

NOW COMES the Plaintiff, RUSSELL WALKER, by and through his attorneys, THE LAW OFFICE OF JARRETT ADAMS, PLLC, and SAMUELS & ASSOCIATES, LTD., complaining of the Defendants, MICHAEL WHITE (Star No. 860), ERIC REYES (Star No. 10126), SEBASTIAN FLATLEY (Star No. 13734), BRIAN DALY (Star No. 9364), RAUL BAEZA, JR. (Star No. 4918), THOMAS GAYNOR (Star No. 5069), the CITY OF CHICAGO, THOMAS FINNELLY, COOK COUNTY, UNIDENTIFIED CHICAGO POLICE OFFICERS, and UNIDENTIFIED COOK COUNTY STATE'S ATTORNEY INVESTIGATORS, states as follows:

### Introduction

Plaintiff Russell Walker was a hardworking, young father with a child on the way when he became a target of the defendants' misconduct. The Defendant police officers planted drugs on him, fabricated evidence, and then lied about it in their reports and testimony, causing Mr.

Walker to spend a decade of his life under the control of the State of Illinois for a crime they at all times knew he did not commit.

Thanks to the diligence of attorneys from the public defender's office, the Defendants were finally caught in their lies. Despite the hard work and villainous ingenuity of Defendant Finnelly, a member of the Cook County State's Attorney's Office who deliberately took misleading photographic evidence as part of the Defendants' plot to frame Plaintiff, some ten years after the fact to the truth finally came to light.

As a result, Russell was exonerated and later received a certificate of innocence. Nothing can make up for missing the birth of his daughter, though, and being stolen from the lives of his children and loved ones as a result of this wrongful incarceration. Despite all this, he has struggled to recover all that he has lost and help those in need, forming the Russell Walker Foundation to teach and mentor youth through sports.

Russell now brings this civil rights lawsuit to seek redress for these losses and to hold the Defendants responsible for their violation for his constitutional rights.

## JURISDICTION AND VENUE

1. This action is brought under 42 U.S.C. § 1983 to address the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution and under state law. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367. Venue is proper under 28 U.S.C. § 1391(b).

## THE PARTIES

2. Plaintiff RUSSELL WALKER was, at all times relevant, a resident of Illinois.

3. Defendant Sergeant MICHAEL WHITE, Star No. 860; Officer ERIC REYES, Star No. 10126; SEBASTIAN FLATLEY, Star No. 13734; BRIAN DALY, Star No. 9364;

2

RAUL BAEZA, Star No. 4918; and THOMAS GAYNOR, Star No. 5069 ("Defendant Officers") were, at the time of this occurrence, duly licensed Chicago Police Officers acting under color of law and within the scope of this employment. They are sued in their individual capacities.

4.     Defendant THOMAS FINNELLY was, at all times relevant, an investigator employed by the Cook County State's Attorney's Office acting under color of law and within the scope of his employment. He is sued in his individual capacity.

5.     Defendant CITY OF CHICAGO ("Defendant City") is a municipal corporation duly incorporated under the laws of the State of Illinois. At all relevant times, Defendant City was the principal and employer of Defendant Officers and Unidentified Officers who acted pursuant to the City's policies and practices. As the employer of the Defendant Officers, the City of Chicago is liable for their torts under the doctrine of *respondeat superior*.

6.     Defendant COOK COUNTY ("Defendant County") is a municipal corporation duly incorporated under the laws of the State of Illinois. At all relevant times, Defendant County funded the operations of the Cook County State's Attorney's Office, which employed Defendant Thomas Finnelly and Unidentified Cook County State's Attorney's Investigators. Illinois law requires that the County indemnify claims against state employees where the County funds the state office that employs them.

7.     UNIDENTIFIED CHICAGO POLICE OFFICERS were, at all relevant times, officers serving in the Chicago Police Department who acted under color of law within the scope of this employment. They are sued in their individual capacities.

8.     UNIDENTIFIED COOK COUNTY STATE'S ATTORNEY'S INVESTIGATORS were, at all relevant times, investigators employed by the Cook County State's Attorney's Office. They acted under color of law and within the scope of this employment. They are sued in their individual capacities.

## FACTS

9.     On the evening of February 21, 2006, Mr. Walker and his brother Jermaine were headed to a family gathering at their sister's house on the north side of Chicago.

10.     At that time, Mr. Walker was a custodial maintenance worker, excited for the birth of his daughter that would happen within weeks.

11.     Mr. Walker rode in the passenger seat as Jermaine drove.

12.     At about 8:30 pm, the brothers were parked in the parking lot of J.J. Pepper's at 4800 North Sheridan Road, where they had stopped to make a purchase before going to their sister's home.

13.     They pulled out of the parking lot onto West Lawrence Avenue.

14.     Immediately they noticed lights from a police car behind them. They pulled over into an alley adjacent to Lawrence House, an apartment building at 1020 West Lawrence Avenue.

15.     Although the Walkers had committed no crime, Defendant Reyes approached Plaintiff's car with his gun drawn.

16.     When Jermaine, Russell's brother, asked Defendant Reyes why they had been pulled over Reyes refused to give any explanation.

17.     Without probable cause, or any other lawful basis, Defendant Reyes then ordered Mr. Walker to get out of the car so the officers could search it.

18.     They refused, and instead asked to speak to a sergeant.

19.     Shortly thereafter, Defendant Sergeant White arrived at the scene. Despite knowing there was no probable cause, or any other lawful basis to believe that a crime had been committed, he, too, ordered the Walkers out of the car.

20.     Upon exiting the car, Defendant Officers used excessive force against Russell. The force used against Russell was objectively unreasonable.

21.     A surveillance camera was mounted in the alley where the events described above transpired. The camera was in plain sight to everyone present.

22.     That camera, which fed images of the alley to an employee inside the adjacent Lawrence House, was part of Lawrence House's security system.

23.     Then, without probable cause or any other lawful basis, Russell was handcuffed and arrested.

24.     In order to cover up their unconstitutional misconduct and deprive Mr. Walker of his constitutional rights, Russell was falsely charged with possession of cocaine.

25.     In furtherance this conspiracy, Defendant Officers falsely claimed in their police reports of the incident that Russell possessed narcotics while in the alley.

26.     This was a complete fabrication.

27.     In furtherance of the conspiracy to deprive Russell of his constitutional rights, Defendant Officers inventoried narcotics and falsely claimed that the drugs had been possessed by Plaintiff.

28.     Those drugs were later used as evidence against Mr. Walker during the criminal proceedings.

29. Defendant Officers White, Reyes, Flatley, Daly, Baeza, and Gaynor all either falsely reported that the narcotics were recovered from Plaintiff or they knew other Defendant Officers were falsely reporting that the narcotics were recovered from Plaintiff and failed to prevent the fabrication despite multiple opportunities to do so.

30. At Jermaine's trial, Defendant Finnelly testified that he was assigned by the State's Attorney's Office to go to the scene of the arrest to take pictures of the alley and to photograph any camera that might be there as part of his duties as an investigator for the Office.

31. Despite the presence of the camera in plain view on the west wall of the alley, Defendant Finnelly intentionally did not photograph it.

32. Rather, Defendant Finnelly conspired with the Defendant Officers to maliciously prosecute Russell and deprive him of his constitutional rights.

33. In furtherance of that conspiracy, Defendant Finnelly photographed other areas of the alley but deliberately avoided photographing the location where Plaintiff's car had been stopped below the camera.

34. Specifically, the camera at issue is clearly visible where it is located just inside the mouth of the alley.

35. The photographs below accurately portray the location of the camera and the lack of obstructions surrounding the camera on February 21, 2006:

 

36.     An inspection of Defendant Finnelly's photographs demonstrates his intentional misconduct.

37.     Defendant Finnelly knew there was a camera in the alley.

38.     Defendant Finnelly intentionally did not photograph the camera in the alley.

39.     Defendant Finnelly took nine pictures, all of which he intentionally took so that it appeared the entire alley was photographed. In none of the nine pictures is the camera portrayed.

40.     The following is an accurate reproduction of the photograph taken by Defendant Finnelly which was used as evidence against Russell to coerce him into pleading guilty:



41.   When Defendant Finnelly photographed the alley facing south, he deliberately positioned

himself. As a result, the telephone poles in the alley block from view the camera.

42.   The following is an accurate reproduction of the photograph taken by Defendant Finnelly

which was used as evidence against Russell to coerce him into pleading guilty:



43. Defendant Finnelly even took close-up photographs of any objects that might appear to be cameras in the overviews of the alley that he photographed.

44. In so doing, Defendant Finnelly intentionally attempted to mislead about the presence of security cameras in the alley.

45. The following are accurate reproductions of photographs taken by Defendant Finnelly which was used as evidence against Russell to coerce him into pleading guilty:




46. Prosecutors relied on the false police reports and the misleading photographs of the alley in deciding to and continuing to prosecute Mr. Walker.

47. Defendant Finnelly even testified that he walked the entire length of the alley, but denied having seen any camera there.

48. Defendants White and Reyes likewise gave false testimony under oath that there was no camera in the alley.

49. On May 21, 2007, two months after his older brother, Jermaine, was sentenced to 22 years in prison the state presented the same false and fabricated evidence to coerce Russell into pleading guilty.

50. Mr. Walker has always maintained his innocence.

51. On October 20, 2017, the charges against Mr. Walker were dismissed and the indictment was vacated in November after the Walkers were able to successfully prove that their convictions were based upon false and fabricated evidence and perjured testimony.

52. In granting the relief, the court said:

> Firstly, it's quite kind to say that the information was incorrect or mistaken. That is not what we're dealing with at all. We're dealing with fabricated evidence, falsified evidence by the State's witnesses. Not only a State's attorney investigator but also a Chicago police officer sworn under oath and testified before a jury as to falsified information. So both defendants relied on the discovery that was presented and the State also believing that their evidence was correct tendered this discovery to the defense showing pictures and photographs of allegedly the alley in question that there was no camera there, testimony – summaries of their testimony in the discovery was, in fact, that the cameras were there – that the camera – that there was no camera there; that there's pictures of the alley that no camera was there; that one of the witnesses even said he went up and down the alley and looked and – he physically went up and down the alley to make sure because there was no camera there. Russell was not sitting back and waiting, doing nothing.
>
> He relied on the information that the State presented in discovery that, in fact, this was the situation. He has no duty to go investigate every piece of discovery that's tendered to the State to see if it's falsified or if it was fabricated. When an assistant state's attorney turns over the information, they are stating this is correct, this is what my witness is going to say. They're validating that, this is what we're going to be relying on at the trial, so that's what the defendants relied on. Russell walker was given this discovery. He relied on this discovery, and it wasn't just incorrect information. It was fabricated. They were lying. So certainly a defendant is not supposed to approach every case thinking that the discovery being tendered to him is full of lies, and this was the main crux of the case. The witnesses were cross-examined at his brother's trial and to say that they're separate situations, they came from the same evidence, the same discovery that was tendered to both defendants; and the discovery was filled with falsified information; that it did not come up until quite some time later that the owner of the building in question came forward to say that, in fact, he did have a camera. He had it then and he has it now.

So it's nothing about nothing working or that they were in the wrong place. They were fabricated. There was testimony under oath before a jury trial by more than one witness for the State saying, in fact, that this camera did not exist.

\* \* \*

And in further looking at it, they really had to work hard to get into a position as to not show the camera. So the falsification is quite great. It's a tragedy that we have to worry about these things and be concerned with these things when sworn officers – Chicago Police Officers, state's attorneys' investigators would take an oath and present falsified information that the jury relied on it, this Court relied on it. The defendant relied on it. This was the discovery that he was tendered, and he's not wrong in relying on it. Pictures were provided, testimony was – summary of testimony was provided. There was a whole jury trial that existed with witnesses testifying under oath as to this fabricated evidence. The motion to dismiss is denied and the conviction is vacated.

53. Mr. Walker then filed for and on March 9, 2018, received a certificate of innocence.

## MR. WALKER'S DAMAGES

54. At the time he was convicted, Mr. Walker was gainfully employed, in a happy and healthy relationship, and expecting a child within days.

55. As a result of the defendants' misconduct, not only did he spend years languishing in prison for a crime he did not commit, he also missed the birth of his daughter and the opportunity to see his children grow up.

56. Additionally, Mr. Walker was stripped of his rights as a citizen of the United States, including the ability to work, travel freely, vote, and freely associate with whomever he pleased.

57. Instead, and because of the Defendants, he was placed in a dangerous, dank, dirty environment that caused him immeasurable psychological and emotional pain, in addition to physical sickness, pain, and suffering.

## COUNT I: 42 U.S.C. § 1983 – Due Process Violation

58.     Plaintiff hereby incorporates each of the foregoing paragraphs as if fully restated herein.

59.     As set forth more fully above, the Defendant Officers and Investigators, acting

individually, jointly, and in conspiracy, fabricated false reports and other evidence and/or

withheld exculpatory evidence, including but not limited to:

       a.  Fabricating evidence that no camera existed in the alley which could have
           recorded the encounter between Mr. Walker and the Defendant Officers;

       b.  Fabricating false reports that drugs were found in Mr. Walker's possession on
           February 21, 2006; and

       c.  Inventorying narcotics from another source and pretending they belonged to
           Mr. Walker.

60.     Absent the Defendant Officers and Investigators' misconduct, the prosecution of Plaintiff

would not have been pursued, and Plaintiff would not have plead guilty.

61.     The Defendants Officers and Investigators' misconduct directly and proximately resulted

in the unjust and wrongful conviction of Plaintiff and his wrongful imprisonment, denying

him his constitutional right in violation of the Due Process Clause of the Fourteenth

Amendment to the United States Constitution.

62.     The misconduct described in this Count was objectively unreasonable and was undertaken

willfully and wantonly, with malice and willful indifference to Plaintiff's clearly

established constitutional rights.

63.     As a direct and proximate result of this violation of his constitutional rights, Plaintiff

suffered injuries including but not limited to loss of liberty, physical sickness and injury,

and emotional distress.

64.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago of pursuing convictions in reckless disregard of the truth by using fabricated evidence.

65.     As a matter of both policy and practice, the City of Chicago directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise and control its police officers, such that its failure to do so manifests deliberate indifference.

66.     Additionally, as a matter of both policy and practice, the City of Chicago facilitates the very type of misconduct at issue here by failing to adequately investigate, punish and discipline prior instances of similar misconduct, thereby leading police officers in the City of Chicago to believe their actions will never be scrutinized and, in that way, directly encouraging future abuses such as those that affected Plaintiff.

67.     Indeed, municipal policymakers have long been aware of the City of Chicago's policy and practice of failing to properly train, monitor, investigate and discipline misconduct by its police officers, but have failed to take actions to remedy the problem.  For example:

    (a)     At a City Council hearing on September 28, 1999, in response to two high profile unjustified police shootings, Superintendent Terry Hillard noted the need for better in-service training on the use of force, early detection of potential problem officers, and officer accountability for the use of force.

    (b)     In June 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

    (c)     In 2001, the Justice Coalition of Greater Chicago ("JCGC"), a coalition of more than a hundred community groups, confirmed the findings of that resolution, concluding that the Chicago Police Department lacked many of the basic tools necessary to identify, monitor, punish and prevent police

misconduct and brutality.  The JCGC findings were presented to Mayor Daley, Superintendent Hillard, and the Chicago Police Board.

68. Despite the municipal policymakers' knowledge of the City's failed policies and practices to adequately train, supervise, investigate, discipline, and control its police officers, nothing was done to remedy these problems.

69. As a result, the Chicago Police Department has continued to respond to complaints of police misconduct inadequately and with undue delay, and to recommend discipline in a disproportionately small number of cases.

70. Indeed, by its own admissions, over 99% of the time when a citizen complains that his or her civil rights were violated by police officers, the City of Chicago sides with the police officer and concludes that no violation occurred.

71. For example, in 2005, at least 1,592 complaints of civil rights violations were lodged against Chicago Police Officers with the Police Department's Internal Affairs Division.  A total of 5 were sustained, and that total may include cases arising in previous years.  *See:* http://4abpn833c0nr1zvwp7447f2b.wpengine.netdna-cdn.com/wpcontent/uploads/2014/12/2005-Annual-Report.pdf at 41.

72. In other words, IAD sustained only 0.314% of the complaints that its police officers had committed civil rights violations in 2005.

73. In 2006, the number of civil rights complaints was 1,492.  Twelve were sustained.  *See* http://home.chicagopolice.org/wpcontent/uploads/2014/12/2006-Annual-Report.pdf at 62.  Based on those numbers, IAD sustained only 0.8% of the civil rights complaints against Chicago police officers in 2006.

74. The same unconstitutionally lax oversight is evident across the multiple entities that have been responsible for investigating police misconduct.  In 2006, for example, the Office of

Professional Standards ("OPS"), which investigates complaints of excessive force, sustained only 57 out of 2,391 complaints excessive force by police officers, or 2%.

75. This trend continued throughout Mr. Walker's wrongful incarceration. The Independent Police Review Authority ("IPRA," the successor to OPS) reported that it sustained just under four percent of all complaints brought against officers for the 2011 to 2012 reporting period. *See* http://www.iprachicago.org/IPRA_AnnualReport2010-2012.pdf at page 31; Tables 1-3 (reporting that 105 complaints were sustained in the 2688 investigations that were closed during the annual cycle).

76. Even in the most extreme example of police shootings of Chicago residents, OPS exonerated CPD officers in over 99% of cases, regardless of the actual circumstances of the shooting.

77. The City of Chicago's investigation of citizen complaints is characterized by unreasonably long delays, despite the relative straight-forward nature of many misconduct claims.

78. For example, one case in which an officer beat a man on his head with a baton, cracking his skull, was thrown out by the Police Board because IPRA failed to pursue charges before the five years statute of limitations had expired. In that case, the complainant had provided a statement and photographs of his injuries just days after the incident yet IPRA took more than five years to decide to pursue charges against the officer. *See* Annie Sweeney and Jeremy Gorner, Police Misconduct Investigation Drags On For Years – Investigative agency's delays can lead to dismissal of charges, Chicago Tribune, June 17, 2012.

79.    Although the City of Chicago has long been aware that its supervision, training, and discipline of police officers is entirely inadequate, it has not enacted any substantive measures to address that deficiency.

80.    Instead, Chicago continues to inadequately investigate citizen complaints. It has also failed to modify its officer training programs to reduce misconduct against Chicago residents or to implement a system to identify and track repeat offenders, districts, or units.

81.    City of Chicago policymakers have consistently maintained an attitude of deliberate indifference, ignoring these issues. At a City Council meeting regarding its oversight of police officers held on October 29, 2014, fewer than twelve council members were present and not one asked a single question about the City's performance investigating fatal shootings by officers or about the number of excessive force complaints the City has sustained. *See* Chip Mitchell, Aldermen skip chance to ask about city's handling of police commander, WBEZ (Oct. 29, 2014), available at http://www.wbez.org/news/aldermen-skip-chance-ask-about-citys-handlingpolice-commander-111016.

82.    The failure of the City's policies does not just stop with the investigating agencies. Even when investigators recommend some form of discipline, the Police Superintendent often overrides that recommendation.

83.    For example, in 2014, Police Commander Glen Evans of the Harrison District was accused of ramming his pistol down an arrestee's throat, the latest in a long line of allegations of abuse against Evans. IPRA recommended that Commander Evans be stripped of his police powers pending their investigation after finding DNA evidence of the victim on Evans's gun. Ignoring IPRA's recommendation, Police Superintendent

Garry McCarthy and Mayor Rahm Emmanuel supported Evans and he remained in his leadership position as District Commander until he was criminally indicted in August 2014.

84. Indeed, in 2012, Superintendent McCarthy promoted Evans to a leadership position in the Department despite the fact that over the course of his career there were over fifty citizen complaints filed against him. A report by the now deceased Chicago epidemiologist, Dr. Steve Whitman, found that Evan was ranked number one out of 1,541 officers he studied as having received the most complaints in his analysis of 13,527 excessive force complaints against Chicago Officers from 1998-2008. See Chip Mitchell, Report: Embattled commander No. 1 for excessive-force complaints, WBEZ (Aug. 5, 2014), available at http://www.wbez.org/news/reportembattled-commander-no-1-excessive-force-complaints-110605.

85. In contrast, when investigators do not recommend any discipline, police supervisors agree with the investigators' determination one hundred percent of the time and never independently recommend disciplining an officer accused of violating citizens' civil rights.

86. In the case of *Obryka v. City of Chicago et al.*, No. 07 cv 2372 (N.D. Ill.) (the Abbate case), a jury found that as of February 2007 "the City [of Chicago] had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

87. The same constitutionally-defective oversight system in place in February 2007 was also in place on February 21, 2006, when Mr. Walker suffered the abuse described above.

88.     Indeed, the problem found to exist by the jury in *Obryka* continues to this day.  In

December 2015, Mayor Rahm Emanuel acknowledged that a "code of silence" exists

within the Chicago Police Department that encourages cover-ups of police misconduct,

and that the City's attempts to deal with police abuse and corruption have never been

adequate.

## Count II -  42 U.S.C. § 1983 - Failure to Intervene

89.     Plaintiff incorporates each of the foregoing paragraphs as if fully stated herein, except as

to Defendant FINNELLY, who is not a party to Count II.

90.     As set forth more fully above, the Defendant Officers and Investigators had a reasonable

opportunity to intervene to prevent the deprivation of Mr. Walker's constitutional rights

but refused to do so.

91.     In failing to intervene, the Defendant Officers and Investigators violated their clearly

established constitutional duty to report all material exculpatory and impeachment

information to prosecutors.

92.     Absent Defendants' misconduct, the prosecution of Plaintiff would not have been pursued,

and Plaintiff would not have been convicted.

93.     Defendants' misconduct directly and proximately resulted in the unjust and wrongful

conviction of Plaintiff and his wrongful imprisonment, denying him his constitutional

rights in violation of the Due Process Clause of the Fourteenth Amendment to the United

States Constitution.

94.     The misconduct described in this Count was objectively unreasonable and was undertaken

intentionally and wantonly, with malice and willful indifference to Plaintiff's clearly

established constitutional rights.

95. As a direct and proximate result of this violation of his constitutional rights, Plaintiff suffered injuries including but not limited to loss of liberty, physical sickness and injury, and emotional distress.

96. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago of pursuing convictions in reckless disregard of the truth by using fabricated evidence and withholding material exculpatory and impeachment as described in paragraphs 84-105 of this Complaint.

## COUNT III: Section 1983 Conspiracy

97. Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

98. As set forth more fully above, the Defendant Officers and Investigators agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights under the Fourth and Fourteenth Amendments, all as described in the various paragraphs of this Complaint.

99. Additionally, before and after Plaintiff's conviction, the Defendant Officers and Investigators further conspired, and continue to conspire, to deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led either to his not being charged, his being acquitted, or his more timely exoneration. Each Defendant shared in the objective of depriving Plaintiff of his constitutional rights in this way.

100. In this manner, Defendants Officers and Investigators, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

101.  In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above – such as fabricating evidence and withholding exculpatory evidence – and was an otherwise willful participant in joint activity.

102.  As a direct and proximate result of the illicit prior agreements and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he sustained injuries, including loss of liberty, physical injury and sickness, and emotional pain and suffering, as is more fully alleged above.

103.  The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and wantonly, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

104.  Absent Defendants' misconduct, the prosecution of Plaintiff would not have been pursued, and Plaintiff would not have been convicted.

105.  Defendants' misconduct directly and proximately resulted in the unjust and wrongful prosecution and conviction of Plaintiff and his wrongful imprisonment, denying him his constitutional rights in violation of the Fourth Amendment and/or the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

106.  As a direct and proximate result of this violation of his constitutional rights, Plaintiff suffered injuries including but not limited to loss of liberty, physical sickness and injury, and emotional distress.

107.  The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago of pursuing convictions in reckless disregard of the truth

by using fabricated evidence and withholding material exculpatory and impeachment evidence, as described in paragraphs 84-105 of this Complaint.

## COUNT IV: Fourth Amendment

108.    Plaintiff incorporates all of the paragraphs of this Complaint as if fully restated herein.

109.    On February 21, 2006, Mr. Walker was detained and arrested without probable cause by Defendant Officers.

110.    On February 21, 2006 Mr. Walker was confined to jail after his arrest without probable cause.

111.    Mr. Walker remained in custody until his guilty plea on May 21, 2007, without probable cause.

112.    On October 20, 2017, the proceeding was resolved in Mr. Walker's favor when the indictment against him was dismissed.

113.    The Defendant Officers at no time prior to Mr. Walker's arrest had any probable cause, nor even reasonable suspicion to detain Mr. Walker.

114.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and wantonly, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

115.    As a direct and proximate result of the legal proceeding maliciously instituted by the Defendant Officers and Investigators, Plaintiff suffered damages, including loss of liberty, physical injury and sickness, and emotional pain and suffering, as is more fully alleged above.

## COUNT V: State Law Malicious Prosecution

116.    Plaintiff fully incorporates each of the foregoing paragraphs as if fully set forth herein.

117. As described more fully above, the Defendant Officers and Investigators maliciously and without any reasonable ground of suspicion, and unsupported by circumstances sufficiently strong in themselves to warrant a cautious person in the belief that Mr. Walker was guilty of the offense, instituted prosecution against him.

118. The proceeding was resolved in Mr. Walker's favor when the indictment against him was dismissed.

119. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and wantonly, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

120. As a direct and proximate result of the legal proceeding maliciously instituted by Defendant Officers and Investigators, Plaintiff suffered damages, including loss of liberty, physical injury and sickness, and emotional pain and suffering, as is more fully alleged above.

**COUNT VI: Intentional Infliction of Emotional Distress**

121. Plaintiff fully incorporates each of the foregoing paragraphs as if fully set forth herein.

122. In the manner described more fully above, by depriving Mr. Walker of his constitutional rights and by maliciously prosecuting him, the Defendant Officers and Investigators engaged in extreme and outrageous conduct.

123. In carrying out the actions described above, Defendant Officers and Investigators either intended to inflict or knew that there was a high probability that their conduct would cause severe emotional distress.

124. These Defendants' actions were willful and wanton, undertaken with malice and reckless indifference to the rights of others.

22

125. The misconduct described in this Count was undertaken by Defendant Officers and Investigators within the scope of their employment such that their employers, the City of Chicago and Anita Alvarez, in her official capacity as Cook County State's Attorney, are liable for their actions.

126. As a direct and proximate result of misconduct, Mr. Walker suffered injuries including but not limited to severe emotional distress.

## COUNT VII: State Law *Respondeat Superior*

127. Plaintiff fully incorporates each of the foregoing paragraphs as if fully set forth herein.

128. In committing the acts alleged in the preceding paragraphs, the Defendant Officers and Defendant Investigators were employees and agents of the City of Chicago and County of Cook, respectively, at all relevant times within the scope of their employment.

129. Defendant the City of Chicago and County of Cook is liable as principal for all torts committed by its agents.

## Count VIII: State Law Indemnification

130. Plaintiff fully incorporates each of the foregoing paragraphs as if fully set forth herein.

131. Illinois law requires public entities to pay any tort judgment for compensatory damages against an employee acting within the scope of his or her employment. Illinois law also requires that Cook County pay any tort judgment for compensatory damages against a state employee where the County funds the state office that employs the tortfeasor. The Cook County State's Attorney's Office is funded by Defendant Cook County.

132. The Defendant Officers and Investigators are or were employees of the City of Chicago and the Cook County State's Attorney's Office, who acted within the scope of their employment in committing the misconduct described herein.

23

WHEREFORE the Plaintiff, RUSSELL WALKER, respectfully requests that this Court enter judgment in his favor and against the Defendants, MICHAEL WHITE (Star No. 860), ERIC REYES (Star No. 10126), SEBASTIAN FLATLEY (Star No. 13734), BRIAN DALY (Star No. 9364), RAUL BAEZA, JR. (Star No. 4918), THOMAS GAYNOR (Star No. 5069), the CITY OF CHICAGO, THOMAS FINNELLY, COOK COUNTY, UNIDENTIFIED CHICAGO POLICE OFFICERS, and UNIDENTIFIED COOK COUNTY STATE'S ATTORNEY INVESTIGATORS, awarding compensatory damages, costs, and attorneys' fees against each Defendant, along with punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY**

Respectfully Submitted,

RUSSELL WALKER

By:   /s/ Jarrett Adams
          *One of Plaintiff's Attorneys*

**THE LAW OFFICE OF JARRETT ADAMS, PLLC.**
561 10 th Ave, Unit 31- D
New York, NY 10036
Phone: (773) 459-4039
Fax: (646) 524-6054
Email: Jadams@JarrettAdamsLaw.com

/s/ Jeanette Samuels
          *One of Plaintiff's Attorneys*

**SAMUELS & ASSOCIATES, LTD.**
2925 S. Wabash Avenue
Chicago, Illinois 60616
Phone: (872) 588-8726
Fax: (872) 444-3011
Email: Sam@ChiCivilRights.com